May it please the court. My name is Jonathan Byrne. I'm here on behalf of Arun Dhavamani, who was the defendant below. Mr. Dhavamani is a native of India who crossed from West Virginia to Virginia, if only briefly, to meet someone he met online. The location of that meeting was chosen by authorities for the purpose of creating a federal offense. A jury then convicted Mr. Dhavamani in spite of insufficient evidence of what he intended to do when he crossed the state with whom he intended to do it. Furthermore, that jury included a person who was biased against those like Mr. Dhavamani, who are long-term legal residents of the United States, but who have yet to become citizens, thus denying Mr. Dhavamani his right to a fair trial. For any or all of these reasons, this court should reverse his conviction. The jurisdictional hook in this case, what makes it a federal offense, is that Mr. Dhavamani crossed from West Virginia into Virginia. There's no dispute that he did that, although there is some dispute as to where he went in Virginia before he turned around and was arrested. The meeting place was chosen by the undercover officers who were the other side of the conversation that Mr. Dhavamani was having via text messages and in the phone call that is in the record. They are the ones who chose the location for the meeting was initially set in Bluefield, West Virginia, and while Mr. Dhavamani was on his way to that location, it was changed to Bluefield, Virginia, just across the state line. Okay, so Mr. your appellant, I'm sorry, I probably wouldn't pronounce his name right, so I'll just call him the appellant, did cross the state line. So are there any cases where we have this particular set of facts that the government chose the location and the defendant voluntarily crossed the state line that have found it to be manufactured jurisdiction? I don't know that there are any cases that specifically have made that finding. This court's decision in Brinkman, though I think is instructive, Brinkman was a situation where a gentleman wanted to murder his business partner and sought a hitman and the FBI found out about this and they provided an undercover agent as the hitman and when it came time to schedule a face-to-face meeting with Mr. Brinkman, the meeting was set about 100 yards across the state line into South Carolina. On appeal, when Mr. Brinkman argued that that was a case of manufactured jurisdiction, this court did not resolve it by saying that Mr. Brinkman crossed the state line and therefore it doesn't matter why the meeting location was chosen. Instead, it said it resolved it on the basis that there was no evidence in the record suggesting why the location was chosen. In this case, we have the district court's findings that the location was chosen specifically to manufacture federal jurisdiction and that wasn't just a passing reference at sentencing. The district court made that finding repeatedly at the sentencing hearing and in the sealed statement of reasons and used that as a basis for imposing a variant sentence. So we have the evidence here that was missing in Brinkman. What's the standard of review here? Is this plain error? Uh, it is plain error. This issue was not raised by the trial counsel. Uh, but I'm sorry, go ahead. Does it make any of it? Go ahead. No, please go ahead, Judge Mott. If it made any difference that our rule seems to be sui generis, that almost every other court has required or rejected this manufactured jurisdiction contention. I think you're right. There's a bunch of Fourth Circuit cases that recognize it, but on plain error analysis, does it make any difference that we're in this alone? I don't think so, Your Honor, because the basic concept that manufactured jurisdiction uh, is a basis for returning a conviction is well established. The parameters of it would not get you a manufactured jurisdiction holding in other circuits. Can we agree on that? It may not, Your Honor. And that's, I agree with you that in other circuits the doctrine has been narrowed somewhat. But I don't think that makes it not plain error in this circuit where that hasn't happened yet. And I think particularly in a case like this where the district court took affirmative actions on the finding that, uh, the way I read this record, there are two officers testifying with respect to this. One of them says there are a number of reasons and then cites one reason. It doesn't tell us any other reasons, it's not manufacturing jurisdiction. And the other officer agrees that yes, this is the only reason, manufacturing jurisdiction. And the district court is troubled by that and keeps saying how troubled he is by it. But I'm not sure he made a finding. I mean, it seems to me the best case for you is that we would send it back to the district court would make a finding if we should conclude that this manufactured jurisdiction principle applies here and is circuit precedent. Or if it's not circuit precedent, then we'd have to take the case on bank to get it rejected because there's enough circuit law recognizing it. Don't you think that's right when we have to send it back for an express holding by the district court? I don't think so, Your Honor. I think the district court made specific findings and like I said, Judge Faber acted on it. He didn't know, which I don't really understand, he didn't know that there was any law or any principle that would prevent him, that would prevent the government from doing what it did for manufacturing jurisdiction. So it seems to me that whatever he was saying, well, anyway, we don't need to argue about that. I think that's your position. Thank you, Your Honor. If there are no other questions on that particular issue, I'll move on to the sufficiency of the evidence. I think you have more questions and I interrupted her. I'm sorry, I probably do have more questions on this, but you can go ahead until I regain my thought. All right. No, go for it. With regards to sufficiency of the evidence, again, there's no dispute that Mr. Dhabhamani crossed state lines. The issue is what was his intent when he crossed them and with whom did he intend to do anything? I do remember my other question. If there had been a state crime instead of a federal crime, if the government hadn't changed the location so it would have been a state crime, what would that state crime have been? What could he be charged with and would it be harsher? I am not certain, Your Honor, what the specific offense would have been in West Virginia. I know there is testimony that they could have, the officers could have brought the case in the state court but did not, but I'm not certain what the answer to that question is. And if we don't think that the district court actually made a factual finding, I understand you feel the district court was clear on that. If we don't find that the district court was clear, then would you agree with Judge Motz that we should send it back to the district court to clarify? I think that would be one way to proceed if the court came to that conclusion, yes. Because certainly the issue is there with the testimony from the officers and if the court concludes that there was not a specific finding, we would like a remand to be able to make that claim. With regards to the sufficiency of the evidence, there were two issues that we raised in the brief and that is what Mr. Dalmani allegedly intended to do when he crossed state lines and with whom he intended to do it. Colloquially, this offense is referred to crossing state lines to have sex with a minor, but the actual offense is to engage in illicit sexual conduct, which is then defined by reference to another statute for a definition of sexual act and that is specifically defined as particular acts and in this case was limited to sexual intercourses to sex, generically. But that term has a broad meaning from the Oxford English Dictionary to Black's legal dictionary. It covers conduct that goes beyond sexual intercourse and oral sex and Officer Weaver, in his testimony, conceded that when the officers in the undercover brought up, well what are we going to do, that Mr. Dalmani never replied that he wanted to have sex and you can look through what his responses were. We could do anything we like, we'll talk, we'll meet and talk and even Officer Weaver admitted that what Mr. Dalmani was doing was looking for someone to talk to and hang out with and so I think particularly when you compare this to typical cases in this area, you have much more explicit discussion of what defendant. I'm sorry, when you're talking about typical cases in this arena and whether this was typical or not sounds more like a sentencing argument, but I still can't get myself beyond the manufactured jurisdiction issue here. I keep thinking about the entrapment line of cases where, how does that, if at all, impact manufactured jurisdiction where if law enforcement merely presents an opportunity for a defendant to engage in a crime without overly coercive behavior on the defendant takes them up on it, that's not entrapment. So this manufactured jurisdiction concept sort of smacks of that line of cases to me, entrapment. How, if at all, in your view, does that impact the manufactured jurisdiction analysis? I think they're probably, they're related, but they're not exactly on point. Typically, they must not be since I don't see them in anybody's briefs or anything, but it just occurred to me. Go ahead. Well, I think when you're talking about entrapment, you're talking about the act that is committed, that would be the one that is done with mens rea, with ill intent. Whereas jurisdictional elements don't require any mens rea. And I think that makes it... Go ahead. I'm sorry, manufactured jurisdiction requires the mens rea. We're requiring that the government did this to manufacture jurisdiction. Yes, I'm on the part of the defendant. The defendant does not have to, does not have to know when he crosses state lines that that creates a federal offense. I don't believe. Generally jurisdictional hooks, the defendant doesn't have to know, doesn't have to have knowledge of them. Right. Whereas in an entrapment situation, if an officer presents a situation for someone to commit an illegal act, the act itself has a character to it that is... That's right. There's knowingly illegal, I would say. That's right. So it's whether this is a federal versus a state crime. And that's, I guess, where I came to the question about what the state crime would have been and whether that penalty would have been harsher, just thinking along the lines of the plain error impacting substantial rights analysis. Yes, Your Honor. And I would be happy to follow up with the court on that in a 28-J letter or something after the argument. I mean, I guess that also takes a lot of speculation as to what, I mean, there are probably a number of state crimes that could have been charged. Maybe some less harsh, maybe some more harsh. That's true, Your Honor. We don't know how a state prosecutor would have viewed this conduct or ultimately what the resolution would have been. I'm not a prosecutor at all. That's entirely possible. It certainly looks like, though, the feds were very... that it'd be a federal crime rather than a state crime. It certainly appears that the officers wanted it to be. Most of the cases that came out of the Sting operation from that weekend went federal. Since my time is about up, I will reserve the remainder of my comments for rebuttal. Thank you. Thank you, Mr. Barron. Ms. Harrell. Thank you, Your Honor. May it please the court, my name is Jennifer Rada Harrell, Assistant United States Attorney for the Southern District of West Virginia. The defendant cannot demonstrate that his conviction was plainly erroneous under the purported manufactured jurisdiction argument when he completed every necessary element of that offense. Appellate cases... Ms. Harrell, under our case law, which is sort of sui generis, I don't understand your argument because all it requires is for the government to do what it did here. And the testimony from at least one of your officers would be sufficient to establish that there was manufactured jurisdiction. Your Honor, I agree that the Fourth Circuit has outlier cases. I think like other cases, they are factually distinguishable in that in the two cases where manufactured jurisdiction has been established in the Fourth Circuit, the government itself supplied the act that met the jurisdictional element, similar to Archer, which has been distinguished in every other circuit from cases like this, where the government invited the jurisdictional element to be met, and the defendant, through voluntary actions of his own free will, committed that jurisdictional element himself. So I believe that Brantley and Coates are distinguishable on the facts. And Brinkman and Davis, where they found that there was insufficient evidence, never actually made a specific finding of manufactured jurisdiction under more similar circumstances to this case. In Brinkman, they did discuss that... But doesn't the fact that in Brinkman and Davis, they found there was insufficient evidence that this was the sole reason, isn't that some indication that those cases found the intent of the officers the most important consideration in manufactured jurisdiction cases? I believe it is proper to infer that they at least believed that the intent was relevant. They did not get to the issue of a factual distinction that other circuits have made, and we can't necessarily assume that that's how they would have ultimately found. But with regard to that specific issue of the sufficiency of the evidence, and I think this is why it's very important to consider that this is a plain error review. The United States was never given an opportunity to establish the facts about what exactly the reason was for the change in the location. Those questions were on cross-examination during trial, essentially going to a nullification argument that the defense was making. And the United States at that point has no motive or reason to go into essentially a mini hearing on manufactured jurisdiction in the middle of a jury trial where that does not go to element. It's required to know the law. The United States knows the law, Your Honor. But at that juncture... I mean, the United States had cross-examination. That argument doesn't do much for me. I understand that, Your Honor. The United States at that point believed that going into that nullification argument in more detail would simply draw attention to it with the jury, and it made a decision that highlighting this... Fair enough. I think you started out saying the United States didn't have any chance to argue, and I think that's not fair. I agree with that assertion, Your Honor. It was more the motivation. We had no reason at that juncture to delve into that in detail. Had a hearing taken place, and the Court has mentioned possible remand, the United States believes that at an actual hearing, this could be established in greater detail. The testimony at trial did indicate that the two officers who issued testimony about either the reason for this, which is what Detective Weaver indicated, was that there was actually other reasons for the... But he only said one other reason, the children. He said there were other reasons. So we have the children, and we have manufactured jurisdiction. That's all we have. And under Brinkman and Davis, they talked about it being the sole reason. So the fact that there is testimony that it was not the sole reason... From one officer. From the other officer who said it was the sole reason. Yes. And I agree with that, Your Honor. Sergeant Snupper testified, however, that in his experience with this task force, which this is not detailed in the record explicitly, but the officers testified they had been on this task force for a number of years, that in his experience, about half of these cases go state and half go federal. And at a hearing, had the United States been given the testimony, they could have established the actual percentage of cases during this undercover task force that went state versus those that went federal to show that there isn't an overarching need to make these cases federal. And that is why the United States believes that this cannot be deemed plainly erroneous based on the limited record in this case. The testimony also established that Detective Weaver, who testified that there was another reason, has been on the task force for years, whereas Trooper Yeager, at the time of that undercover operation, was not even fully a member of the task force. So to place greater weight on her statement as someone not even on the task force and who was unlikely to be making those decisions versus a more senior task force officer is another argument the United States could have put forth at an actual hearing if it had been given that opportunity. Well, I think it's a credibility thing. The district court's there. The district court judges credibility. The district court said throughout all of this that he was very deeply troubled by what happened. You well may be right that we should remand, but I'm not so sure that the United States was treated unfairly here. I think it was unfair notice that the district court was worried about this, and no one seemed to know anything about this manufactured jurisdiction. So, you know, I don't know that you get the benefit of not being told that we are now talking about manufactured jurisdiction. You have some obligations to know the law yourselves. And the United States, to the variance argument, did attempt to distinguish this and indicate why it was not manufactured jurisdiction. Although in that context and given comments from the court, it appeared that he understood and the United States took it that he understood that this was not a legal manufactured jurisdiction argument that would result in a dismissal. He noted that there was no law or policy that allowed him to find the government had acted improperly. And in that point, again, the United States did not have motivation to then put on more additional evidence to try to prove that the case should not be dismissed. So, are you suggesting to me that the United States knew all about manufactured jurisdiction and didn't think it was in its best interest to bring it to the attention of the district court when the district court is saying he's having all this trouble? Is that what you're saying? No, Your Honor. The United States is saying that given that the court agreed with us as to the law, we did not feel... I don't think that that's the case because he said there was no law or principle that would let him do anything about it. And you may not agree that it applies in this case, but I think you agree that there is a law or principle that is out there that he could have relied on. Your Honor, it's the position of the United States that the law does not cover this case and that this case falls into the factual group of cases. So, could you just articulate what the government's view is of the law of manufactured jurisdiction in the Fourth Circuit? The government's position is that there are cases that actually have found manufactured jurisdiction, but those cases factually were addressing a situation where the government supplied the act that met that element. And the defendant did not complete the jurisdictional element. This puts it in line with cases in other circuits that have made that finding. Every other circuit has found in different contexts where the defendant voluntarily engaged in that action, that there was not manufactured jurisdiction. And this court has not made a decision on that fact pattern. And the fact that every other circuit has distinguished between those two, the United States is of the position that this court has not made a pertinent binding decision with regard to this specific fact pattern. Brinkman and Davis did not make that ultimate finding. They said there was insufficient evidence and the United States would agree on that. So, your position would be then, since the Fourth Circuit doesn't have an opinion on this particular set of facts, that the error could not have been plain? That is correct, Your Honor. For it to be plain error, there has to be some precedent that would indicate that this was erroneous. And a precedent for this fact pattern, which is a very critical factual distinction that not a single court has ruled that that fact pattern is manufactured jurisdiction. And this is, in fact, similar to the entrapment argument, which the jury was instructed on entrapment and rejected that argument, despite the fact that defendant had also made these manufactured jurisdiction claims for nullification during the case. Ms. Harrell, but don't here you have a lot of things here. For example, you have this geographical uniqueness that you're dealing with. Two locations have the same name. They happen to be in different states, correct? Bluefield, West Virginia, Bluefield, Virginia. I mean, literally, you could just cross the street in whatever and you're in one or the other. And here, so you have that sort of just sort of unique thing there. But you also have, he was on his way to a Bluefield, West Virginia location. Whatever his intent was for going, he was going to a West Virginia location. And then you changed it to Virginia location just across the board. So you intercepted whatever his intent was. For example, let's say he's leaving home. I'm intending to go to West Virginia. You intervene and tell him, go to a location, didn't say West Virginia, but a location that happened to be in West Virginia, just across the border. If that's not, that's what manufacturing is, is to facilitate, to cobble together, to make it happen. That's what manufacturing is, not hammering on the mail. I mean, so when you put that together, you know it's a close border. It's almost like saying, if she was on the other side of the street and said, and he stopped and said, well, this is possible. I come back and said, no, come over here. Step over here. Step about 10 more feet. Would that be manufacturing? The United States does not believe it's any more manufactured than if they had set a location 10 miles into Virginia or 30 miles into Virginia. The defendant voluntarily, knowing that the location was in another state, continued with that same intent to travel across state lines, which is the element of this particular offense. He knew and he was told in the text messages that the new location was in Virginia. He voluntarily moved to that location. And just like any undercover operation, the United States or the law enforcement officers set all the parameters. They determine the age of the purported minor. They determine what level of sexual activity they're willing to agree to. They also determine the meeting location. And this defendant, knowing that location was in another state, continued. He did not stop. He did not turn around and say, we agreed to meet in West Virginia. I'm not going to Virginia. He had that intent. That intent led him to drive into Virginia. And the fact that it was only a short distance into Virginia is not a distinction that the statute makes. It does not require that they drive extensively into another state. It merely is that they cross state lines. And he drove right across. That's what the governor was looking for, right? Just for him to cross over, wasn't it? Well, the testimony on that, Your Honor, was mixed. But you have to stand by what was very clear. It said that was his sole purpose. One of your own witnesses. You can't wish that away. Matter of fact, you had a car sitting near the border, didn't you? There was a car sitting near the border, Your Honor. For example, let's say he was on his way and all of a sudden said, you know what, I'm not going to do this. I'm not going. And he was still in West Virginia. But he was so close to the line that in order to do that, he'd have to at least drive a little further so he could turn around and come back. Would that be a federal crime? Your Honor, if the evidence showed that his intent when he crossed that line at that moment was no longer to engage in sexual activity with a minor, then no, that would not be a federal crime. Because the crime is that he has that intent in mind at the time he travels across state lines. So how could he defend that? Well, Your Honor, if he put forth evidence, either in the form of his own testimony or text messages. Oh, he has to justify? He has to justify? Not necessarily, Your Honor. We often will see text messages where they will say, you know what, I've changed my mind. I don't want to meet you anymore. And if he had sent a text message, for example, the fact that he then later crossed into Virginia to turn around would not be a federal offense. But the GPS shows he was only there 27 seconds. He was intercepted rapidly, Your Honor. 27 seconds. So you didn't even give him a chance to know what he was really doing in this case, really. I mean, is that based on what you want him crossed over? That's it. 27 seconds and you nab him. You have the chance to see whether he was, what he was going to do or anything. Well, never mind. Here's this, my question here is this. Is this case a little rare? He was on a site for adults to meet adults. He had many times tried to engage everyone he was engaging and was an adult. And then you have a posted person that's 18 years old. You weren't on one of those little kiddy sites. Everybody knows that. You just tell by the name of them and the genre and the chatter, they're looking and trolling for minors. But you go to a site where people are trying to meet adults, which is totally illegal. And you tell him that she's 18 by posting. And then you have some ambiguous conversation. He hasn't mentioned about pregnancy and all those things. And every time she was pushing that, what do you want? He said, well, I don't know. Let's talk. We don't know what might happen. That's what he was saying. And counsel is right. He never definitively said we don't have sex. He kept saying, what are we going to do? How long is it going to take? He said, I don't know. Let's talk. Let's see what flows. He never said that. And then you get him across the board and you don't give him a chance of whether he's going to go up there in a place, do anything. Is this case in reeks of just incredible overreach on the federal government? Your Honor, the United States respectfully disagrees with that. And the jury disagreed with that. The jury found that he met all the elements. And the statute does not require someone be a pedophile. It requires that once you know someone is a minor, you travel to engage in sexual activity with that. And he had been told twice in a very short span of time that this girl was 15. Even though initially he may have thought she was 18, he found out she was 15 and that did not deter him. And those people who are opportunistic and want to have sex and don't care about the age are just as guilty of violating this offense as someone who is seeking out children directly. The statute does not distinguish between those two types of individuals. When the conversation said that he was definitely going to have sex with her. Your Honor, I believe there are a number of points where a jury could rationally. I'm not talking about a jury. I'm talking about facts. We have to look at facts for sufficiency. We know what the jury did. The question, where in the conversations did he say he was going to have sex with her? Well, for example, Your Honor, he indicated that he would use protection when she was concerned about pregnancy. He never said, oh, we're not going to have sex. You don't need to worry about that. When she was worried about pregnancy, he said, we'll use protection. That is indicative of someone being interested in having sex. And a jury could reasonably infer that the only reason you need protection to avoid pregnancy is if you're engaging in vaginal intercourse. Juries can use their own knowledge and personal experience that that is how babies are made. And that, along with him asking about her status as a virgin, asking if she's interested in trying it after he learned that she was a virgin. And he was saying, if you like it, I will engage in it. We don't have to show that he... What does virgin have to do with her age? It doesn't, Your Honor. The age question and his sexual intent are two separate elements. He knew her age and he asked if she was a virgin. And the virgin goes to his intent to engage in adult can easily be a virgin. But when you bring up someone being a virgin, it indicates that you are discussing sexual activity. If you're just going to chat, you generally don't care whether you're talking to a virgin or a non-virgin. And I believe that's what the jury... Why does he have to believe what she said versus what she posted? That's a question for the jury as to whether it was reasonable for him to believe what he initially was told and then was told was untrue and not the facts or whether he, once he became aware of new information. It's interesting that of all these sites that presumably exists for clear trolling for minors, why does the government go to sites like this where people are trying to... Some people are lonely. They want to meet people. Why do you do that? I mean, I'm telling the FBI busy about some other things and crimes all over and things that... Why do you go to a site with that kind of clear ambiguity? Your Honor, this is not in the record. And I noticed I'm out of time. I just wonder. I mean, it just seemed like a lot of things going on in terms of the country, in terms of FBI investigating, working on. Why would you go to a site where adults are trying to meet adults? With regard to how this is done, Your Honor, many of these adult sites actually are frequent situations where minors are involved. In fact, this specific site that was used has actually been flagged by various parent organizations as one that is a high risk. And it actually had to later increase the age because it was so commonly being used for minors to engage in sexual activity. Further, those sites that you refer to that actually specifically are targeted toward pedophiles and individuals who are seeking out specifically minors, those often require various evidence at the beginning to allow a user to join, many of which require a user to verify their interest by... Speaking of evidence at the beginning, why did the government at the beginning have this undercover agent say that she was 18 and not 15 right away? Your Honor, she did not make a statement that she was 18, but her profile had to indicate that she was over 18. If you do not select an age over 18, you cannot create a profile on that particular website. And her profile picture looks 18. There was testimony, Your Honor, that that is an actual image of a 14-year-old. She may have been a precocious 14-year-old. That looked 18. And that is with teenagers. A 12-year-old can look 18, an 18-year-old can look 14. What mattered was that it was a teenager and he indicated that... It wasn't a teenager. It wasn't a teenager. It was a grown woman. Oh, Your Honor, with regard to the picture, there was testimony by the officer that the photographs that he used were of a... They were of a fellow officer, but when she was 14. Oh, I see. Can I ask you, getting back to a question that one of my colleagues raised earlier, what would be the state crime? If we hadn't gotten this person across the state lines, what would have been charged with? Well, I agree with Judge Thacker. There are probably a number of state crimes, but the one that I know is most commonly used in these type of situations is solicitation of a minor via... I don't know if it's a cell phone or how they describe it, but using a cell phone or computer to solicit a minor to engage in sexual activity is a state crime. I do not offhand know that penalty. I am happy to submit a 28-J letter that would list... Yeah, I would appreciate that because I'm trying to understand why the federal government was so interested in getting him across the state line. And the only thing I can think of is that you would get a greater penalty for it. Can you think of another reason? Your Honor, the United States believes Officer Weaver's testimony that there was a concern about the location, the rec center that was actively being used versus Bluefield College, which was not in session at that time of year. Yes, but isn't there testimony that talks about this as sort of a continuing thing? Indeed, we have another case here today that comes out of the same sting. I don't know if it's exactly the same place, but South Carolina to West Virginia to Virginia. And there was testimony from the officers. There would be three or four of these a day. Your Honor, Kibble, the other case we have in a little bit, was actually a different weekend from the same operation. It's been an operation... I understand, but you're left to think, was this just the only incident like this that happened that day? Is that your testimony to us? No, Your Honor. Right. So what I'm trying to do is to understand what is the government trying to do here? I mean, it always sets up here and for a weekend just tracks people going back and forth. Is that what it does? These undercover operations do generally set up on border locations and watch for individuals traveling across state lines. And this is something that would have come out at a hearing, Your Honor. Sergeant Snuffer was correct. In many of these operations, half or more of the cases end up going to state. The Kibble case, which we have later today, was in Parkersburg, West Virginia. And actually more of those cases out of the Parkersburg operation went to Parkersburg's Wood County State Court in West Virginia. I believe there were nine arrests and three of them went federal, six of them went into state court. So this is not an operation where... And this would have been presented at a hearing on manufactured jurisdiction. This is not a task force that is obsessed with making federal cases. So I guess we could compare... Go ahead. Sorry. So I guess we could readily compare then the sentences for the people that go state out of this task force versus those that go federal. There probably is a record, Your Honor, that we could look at comparing the sentences in other operations. Well, but in this, you told us this wasn't even the only one this day. I don't want to say specifically that day, but that weekend, there were a number of arrests made by this task force. I believe the operation lasted three days. Would we be interested in seeing the comparison? If the court is interested, the United States can supplement the record with that information. I guess the chief judge will decide that. All right. I think it's a very good inquiry because it's interesting. You said some six went to this place. Is that arbitrary? I guess all of them crossed the line. So then you just decide who gets to go federal, who goes to state. I should clarify, Your Honor, those six that went state in Parkersburg, they traveled within West Virginia. They did not cross the state line. They drove from a location in West Virginia to another location in West Virginia and did not cross the state line. Oh, you gave them a West Yes, it was similar to this operation. How would you give them West Virginia, give somebody else Virginia or the other state? Well, in this case, Your Honor, I believe it is because of the reason that Officer Weaver suggested. We have no problem with allowing someone to drive from West Virginia to West Virginia and have it be a state case, which is why the United States. But the other officer said the other officer said it was to create federal jurisdiction. That is true, Your Honor. That was the sole reason. That is true. But again, the context of that did not allow us to further or did not. It did allow us, but it didn't give us any motivation to ask her, were you the one who made that decision? What is your basis of knowledge? We would have simply drawn attention to a nullification argument had we made those ask those questions. Those clearly would have been relevant at a hearing on manufactured jurisdiction. And that officer, as a junior officer, not even a member of the task force, I think her testimony would be that she clearly was not the one. Was there anything that kept the government from asking her those questions at trial? There wasn't technically, Your Honor, but as that wasn't actually a legal issue, I thought you said it went to jury know that they were going to jury nullification. Your Honor, the United States did not believe that that was a strong nullification argument. We argued against it in closing, but we did not feel the need to emphasize that factually on our cross examination and give credence to that argument. I am well over my time if there are no further questions. Thank you, Miss Harrell. Thank you very much, Mr. Barrett. You have some time reserved. Yeah, thank you, Your Honor. I want to pick up from something that Chief Judge Gregory mentioned in talking about sufficiency. And that is the vagueness of all of the talk about sexual acts and the age and things. Jurors are allowed to make inferences, but they have to be reasonable inferences, and they have to be based on facts in the record. And I need to clarify something that was in our reply brief as regards to the Bonner case and your opinion in that, Chief Judge Gregory. That was a robbery case where the identification of the robber, one of the robbers, was that he was wearing a Yankees cap. And officers found a take DNA profiles from the headband inside the hat. And there were multiple profiles, and there was one that was predominant, and that was Mr. Bonner's. And the district court had granted a Rule 29 motion, judgment of acquittal, rejecting the government's argument that the jury could infer from the fact that his DNA profile was predominant that he was the last to wear it. And the district court said that was an assumption that the most prominent profile comes from the last person to wear it. And in affirming that, this court said that any assumption that Bonner was the last wearer is an impermissible inference by the jury. And I elided that in our reply brief, and I apologize for that. But the point remains equally as strong. The jury, in order to infer that Mr. Dahabmani had the requisite intent to satisfy the elements in this case, requires them to assume what sex means, requires them to make assumptions about that somebody who lists their age as 18 on a social media profile really isn't. And there aren't facts in the record on which to base inferences that lead to the elements. Do you agree that there are no Fourth Circuit cases directly on point for the manufacturer jurisdiction issue here? Yes, Your Honor, I do, unfortunately. All right, then how could it be plain error? Because I think the manufacturer jurisdiction itself is not a circuit. That the parameters are different in other circuits does not make it not a plain error. So what your response to the first question was that you agree there is no Fourth Circuit case right on point. I thought there was a body of Fourth Circuit law, four cases that you relied on, and you relied on those to say that we had plain error here. And now you're telling us that you recognize that they are all distinguishable? Oh, no, Your Honor, I'm sorry. I was unclear there. I cannot point to a specific Fourth Circuit case that is exactly like this one that says that we should prevail. There is a body of law in the Fourth Circuit that, if applied to this case, says that we should prevail. But there is not a one-to-one specific match with a prior case. I think even though it was a loss for the defendant, the Brinkman case is the closest we can get. And what's important about Brinkman is that if the law was narrowed, as it has been in other circuits, that would have been the much clearer basis to reject that argument instead of wading into what the facts were. The fact that they're into the facts suggests that if the facts had been better, had been more clear, then Mr. Brinkman would have prevailed. And in this situation, we have the findings of the district court. And I wanted to point out on the findings, particularly its joint appendix, page 555, which is from the sentencing hearing, where the district court says, because of the fact that the agents, and I heard the evidence, they consciously made the decision to encourage the defendant to cross the state line. And it seemed to me the only motive for that was to get this case in federal court. So I'd submit that's a specific finding. I also wanted to highlight one thing in my 20 seconds left, and this goes back to my discussion of assumptions and inferences. The discussion between Mr. Dahabamani and the undercovers about birth control was not, I'm afraid I might get pregnant, and then the comeback is I will use protection. It was, I'm sorry, we can take care of that. And that's different than we will use some particular kind of protection that implies a particular sexual act. Because after it could also take care of it by not doing anything at all. And they found no condoms on him, did they? Correct, your honor. No condoms, no child pornography on any of his devices. If there aren't any other questions, we'd ask that you reverse Mr. Dahabamani's conviction. Thank you very much. Thank you very much, counsel, both of you for your fine arguments. We wish we could come down and shake your hands. We can't do that, but please know nonetheless that we very much appreciate your arguments and your help to these thorny cases and trying to resolve them. Thank you so much. I wish you both to be safe and stay well. Take care. Bye-bye. Thank you, your honor.
judges: Roger L. Gregory, Diana Gribbon Motz, Stephanie D. Thacker